IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 20, 2004 Session

## DAVID HODGE, ET AL. v. SHELLY RENAE CORNELISON, ET AL.

**A Direct Appeal from the Chancery Court for Madison County**
**No. 59080     The Honorable Joe C. Morris, Chancellor**

_____

**No. W2003-00962-COA-R3-CV - Filed August 12, 2004**

_____

In boundary line dispute, owner of southern tract of real property (appellee) brought action against adjacent land owner to the north (appellant) to quiet title and restrain appellant from alleged offending use of disputed piece of property. Appellant filed counter-claim to quiet title and have appellee ejected from property. Trial court decreed appellee lawful owner of disputed property, relying upon evidence of three iron pins referenced in deed to appellee as the proper boundary markers. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

T. Holland McKinnie of Franklin for Appellants, Shelly Renae Cornelison and Christopher Cornelison

John S. Little of Jackson for Appellees, David Hodge and Cindy Hodge

**OPINION**

This case involves a boundary line dispute between real property owners in Madison County, Tennessee. In 1972, Joe and Alvana Broom were the owners of a 252 acre tract of real property located on Liberty Claybrook Road in Madison County. By deed dated May 8, 1972, Linda Jane Broom[1] conveyed to John Washburn, and his wife, Regina Washburn, a parcel of land located in the southern region of the Broom tract, described as follows:

---

[1] Linda Jane Broom's relation to Joe and Alvana Broom is not specified in the record; however, there is no dispute that she had proper authority to transfer the pertinent tracts of land.

> BEGINNING at an iron pin in the western margin right-of-way Liberty-Claybrook Road, said point being southeast corner of Joe L. Broom tract; runs thence west a distance of 318 feet to an iron pin; runs thence south with boundary of George Curtis tract, a distance of 600 feet to an iron pin on the western margin of Liberty-Claybrook Road; runs thence with the western margin of said road following a curve to the northeast a distance of 780 feet more or less to the point of beginning, and containing two (2) acres more or less.

This parcel shall be hereinafter referred to as the southern tract.

On May 13, 1972, Linda Jane Broom conveyed by deed to Robert Aspell, a parcel of land from the Broom tract described as follows:

> BEGINNING at an iron pin in the western margin of right-of-way of the Liberty Claybrook Road, said point being the northeast corner of [John E.] Washburn tract; runs thence 318 feet to an iron pin; runs thence north a distance of 310 feet to an iron pin; runs thence east a distance of 328 feet to an iron pin; runs thence south following the Liberty Claybrook Road a distance of 310 feet to the point of beginning, said tract containing two (2) acres, more or less.

This parcel shall be hereinafter referred to as the northern tract.

Robert Aspell died on September 29, 1975, devising his interest in the northern tract by will to Catherine Karp and Margaret Morris. Catherine Karp and Margaret Morris eventually transferred their interests in this property by deed to Ronald S. Kessler and his wife, Sharon Bryant Kessler. By deed dated March 15, 1977, Sharon Bryant Kessler transferred her undivided interest in the northern tract to Rufert Wayne Rogers ("Rufert Rogers") and his wife, Linda Rogers. The description in the Kessler to Rogers deed is identical to that of the Broom to Aspell deed.

In April 1995, John Washburn transferred his interest in the southern tract to the appellees, David and Cindy Hodge ("the Hodge's" or "Appellees"). The deed, dated April 6, 1995, erroneously stated that the southern tract ran from the western margin of Liberty Claybrook Road "following a curve to the northeast *a distance of 880 feet more or less*...." (emphasis added). The parties stipulated that the deed description should read "780 feet more or less." The Washburn to Hodge deed description of the property is identical to the description listed in the Broom to Washburn deed in all other respects.

On September 24, 2001, Rufert and Linda Rogers signed a deed conveying their interests in the northern property to their daughter, appellant Shelly Renae Cornelison, and her husband,

Christopher Cornelison ("the Cornelison's" or "Appellants"). The description in the deed from the Rogers's to the Cornelison's is identical to the description contained in the deed from Broom to Aspell.

The properties owned by the parties in this matter adjoin at the northern boundary of the Hodge's property and the southern boundary of the Cornelison's tract. The sole dispute involves a pie-shaped wedge of property consisting of approximately one-third of an acre of land, located at or near the parties' respective northern and southern boundary lines. The parties specifically dispute the proper location or starting point for the northeast corner of the Hodge's property. Both parties claim right of ownership to the disputed property.

On October 10, 2001, the Hodge's filed a complaint against Rufert and Linda Rogers to quiet title in the disputed tract of land, and for the ejectment of the Rogers from the land. Appellees' complaint prays, *inter alia*, that the court order Rufert and Linda Rogers to remove, at their own expense, "any and all fixtures which they have erected or caused to be erected upon the subject property in full or partial state of construction," and to pay to the Hodge's full damages for any waste, damage, or injury to property caused by the Rogers.

This same day, the Hodge's filed a motion for a temporary restraining order against Rufert and Linda Rogers to enjoin the Rogers "and their agents or employees from erecting improvements altering the character of [the] land, or the performance of any work upon a tract of land which Defendants are attempting to possess and appropriate for their own use and trespass upon." The court granted the Hodge's motion and, by agreed order entered October 29, 2001, the temporary restraining order was extended "indefinitely pending further orders" of the trial court.

On October 29, 2001, an agreed order was entered substituting Christopher and Shelly Renae Cornelison as party defendants. The parties agreed that the existing temporary restraining order was binding as to the newly substituted party defendants.

The Cornelison's filed an answer and counter-claim on November 5, 2001, seeking dismissal of the Hodge's complaint. Appellants' counter-claim to quiet title to the disputed property states in pertinent part:

> The Counter-Plaintiffs allege that any claims which Counter-Defendants may make as to the above described premises of the Counter-Plaintiffs are invalid and of no force and effect and that all such claims have been extinguished and barred by delivery of the aforementioned deeds to the Counter-Plaintiffs or in the alternative, by acts of a continuing nature which have continued for a period in excess of that required by statute for the vesting of title by adverse possession and the Counter-Plaintiffs are seized and possessed of said

-3-

premises free of, and wholly discharged from, any and every such claim.

The Counter-Defendants have encroached or otherwise trespassed upon the property of the Counter-Plaintiffs, and should be permanently enjoined from such encroachment or trespass in the future.

A non-jury trial on the Hodge's complaint and the Cornelison's answer and counter-claim was held on January 27, 2003. David Hall testified as an expert witness at the hearing on the Hodge's behalf. Hall is a licensed land surveyor who was retained by David Hodge to perform a survey of the lot referenced as the southern tract. James Akin, a licensed engineer and surveyor, testified as an expert witness for the appellants.

The trial court's "Findings of Fact and Conclusions of Law" from the January 27, 2003 hearing were filed on March 5, 2003, and provides in pertinent part as follows:

### A. Findings of Fact

1. This matter involves a property line dispute over the appropriate delineation of the southern boundary of the Cornelison property and the northern boundary of the Hodge property. The area in dispute consists of [a] "pie" or wedge shaped area of land.

2. Both the Cornelison's and Hodge tracts of land were divided from a single larger tract owned by Linda Jane Broom.

3. Hodge's predecessor in interest, John and Regina Washburn, received their tract of land first in time over Cornelison's predecessor in interest. The Cornelison deed and all deeds for his predecessor in interest reference the Washburn/Hodge property.

4. At the time Broom conveyed to John Washburn, (Hodge's predecessor in interest), iron pins were located in the northeast corner, northwest corner, and southern tip of this tract of land.

5. The iron pins were called for in the deed of Broom to Washburn. The iron pin in the northeast corner of this property is the reference or starting point for the deeds for both tracts of land. For the deed to Cornelison's first predecessor in interest, and in each deed thereafter including Cornelison's, the deeds specifically refer to an "iron pin ... said point being the northeast corner of J.E. Washburn tract."

6.  John Washburn and his wife, Regina Washburn, held title to this property from May 8, 1972 until April 6, 1995 when they transferred the property to David Hodge.

7.  During this time, John Washburn did not move the iron pins which delineated the boundaries of their property based upon the deed received from the Brooms.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

9.  David Hodge did not move the iron pins which he noticed at the time of his purchase of this property.

10.  The iron pins which David Hodge saw appeared to be old, and were consistent with one another.

11.  At the time of Hodge's purchase of the property, James Akin performed what, he called, a "mortgage survey."

12.  When Akin's performed the "mortgage survey" in 1995, he noticed the iron pins as described by John Washburn and David Hodge.

13.  At that time, Akin noticed that these iron pins were old and consistent with one another, which led him to believe, from a surveyor's standpoint that the iron pins were set by the same person in order to delineate a boundary.  Additionally, based on a review of the deeds, iron pins delineated property lines to other adjacent property divided out of the Broom property.

14.  When James Akin performed the "mortgage survey" for David Hodge, James Akin did not find any encumbrances nor did he note any inconsistencies regarding the property lines.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
16.  David Hodge first became aware of any issue in reference to the boundary on the northern part of his property when Cornelison's predecessor in interest, R.W. Rogers, came to Hodge and alleged that the southern boundary to the Cornelison property was south of a tree and fence line which is generally consistent with the iron pins described by Hodge, Washburn, and Akin.

-5-

17. Although the fence line that runs between the northeast and northwest pins of the Hodge property is somewhat south of a direct line from between those two pins, Hodge had always treated the fence line and old tree line as the property line between the two tracts of land.

18. Likewise, Hodge's predecessor in interest, John Washburn, had always treated this old fence line and tree line as the property line despite the fact that it was slightly south of the above described pins.

19. Washburn cared for and maintained all property north to the old fence line/tree line which included maintaining a well, mowing, and weeding. Washburn also put a dog pen in this area.

20. On the date of the purchase of the property forward, Hodge and his wife cared for this same area which included mowing, poisoning, construction of a sitting area, caring for trees, removing brush, planting a flower garden, maintaining a well, caring for frontage, and tending of grapevines.

21. From the time of his receipt of the property ... Rogers ... cared for land south of the old fence line/tree line....

22. The area in conflict in this property line dispute is a pie-shaped area with the primary point of controversy being the appropriate location of the northeast [corner] of the Hodge property. James Akin and David Hall both testified that the nature of the conflict from a surveying standpoint would be considered a "deed overlap." This is a situation [where] there is not enough property to satisfy the deeds for the two adjacent tracts of land.

23. David Hall and James Akin testified that the iron pins located on the property were of the same type, age, appearance, depth, and were entirely consistent with one another. According to David Hall's testimony, the locations of the iron pins were generally consistent with an old fence line/tree line on the Hodge northern boundary and the Cornelison southern boundary. Hall further testified that when comparing the fence and tree line with the area in dispute, the old fence/tree line was more consistent with the deed calls than with the area claimed by Cornelison.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

25. Akin stated that circumstances in which there is a deed overlap and insufficient property to set aside both deeds according to the legal description, from a surveying standpoint, it is important to take all evidence possible to make a reasonable judgment as to the intent of the original conveyances in the deeds. This evidence would include tree line/fence line, fence posts, iron pins, what the landowners say, and the length of time the iron pins are in existence.

26. Akin formed his opinions as to the property line by using a fence post in the northwest corner of the Cornelison property on the basis that a fence post is more reliable and less likely to be moved than an iron pin. David Hall disagreed with this from a surveyor's standpoint. He stated that an iron pin is just as reliable as a fence post.

**B. Conclusions of law**
1. It is a well established principle in the State of Tennessee that the intent of the parties who originally conveyed the property is controlling. [(citations omitted)].

*****************************************************

4. Where there is a conflict, an older grant [or] deed would prevail over a younger grant or deed. ***Hitchcock v. Southern Iron and Timber***, 38 S.W. 588 (Tenn. Ct. App. 1896).

5. In determining a disputed boundary, a court must first look to natural objects or landmarks, next artificial monuments or marks, then to boundary lines of adjacent landowners, and then the courses and distances. ***Thornburg v. Chase***, 606 S.W.2d 672 (Tenn. Ct. App. 1980).

6. In this case neither tract of property is bounded by a natural monument or marker.

7. Further, Cornelison's expert, Akin, testified that there is a problem with either one or both of the two deeds but that he could not determine which deed contained the problem.

8. Both experts testified that although no fence lines were called for in either deeds for the two tracts of property and although no fence lines were called for in any other adjacent properties, fence

lines were generally consistent with all transfers of property on adjacent tracts of land that came out of the Broom property.

9. For the area in dispute between the two tracts in question, the predecessors of the present parties have acquiesced the fence line/tree line as a boundary line.

10. There is clear proof that iron pins as called for in the deed of Hodge were located on the property at the time of the transfer of his property to Hodge's predecessor [in] interest, Washburn. These iron pins were also noticed by [Akin], when he performed a mortgage survey on the property in question in 1995. They were also seen by Cornelison's predecessor in interest, Rufert Rogers and by Hodge's predecessor in interest, John Washburn.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

12. In this case, the existence of the iron pin [that] was called for in the Broom to Washburn and Washburn to Hodge deed is a sufficient marker for which this court can rely in delineating the boundaries. The fact that these iron pins are generally consistent with an old fence and tree line is further evidence that the original intent of the parties was for the old fence or tree line to be the boundary of the property between these two tracts of land. Further, over the course of the years, acquiescence of the predecessors in interest to the existence of the old fence and tree line as the boundary line is further evidence of the intent of the parties. In other transfers from the same original tract to adjacent properties to those at issue, iron pins were called for and were consistent with old tree/fence lines. This is further evidence that the original intent of the parties conveying this property was for the iron pins consistent with the tree/fence line to mark the boundary.

13. The predecessor in interest of the Hodge property was first in time and in rights over Cornelison's predecessor in interest. The original deed to Cornelison's predecessors in interest even references the iron pin on John Washburn's tract of land.

Wherefore, the Court hereby concludes that the iron pins originally existing at the northeast corner of the Hodge property which was removed by R.W. Rogers, should be replaced in its position according to the survey of David Hall.

Further, the claim of the property by Cornelison, results in an encroachment in the land occupied for numerous years by Hodge and Hodge's predecessors in interest and on which Hodge's well exists. Both deeds should be reformed to reflect such boundaries and properly recorded.

In a final judgment entered April 8, 2003, the trial court adopted by reference the above-quoted findings of fact and conclusions of law, and decreed the Hodge's "the lawful owners of the tract of land in dispute." The Cornelison's filed a timely notice of appeal of the court's final judgment, and present for review the consolidated issue of whether the trial court erred in decreeing the Hodge's the lawful owners of the disputed tract of land.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

It is acknowledged by both parties that resolution of the dispute in this matter hinges upon identification of the northeast corner point of the Hodge property. The trial court determined, *inter alia*, that the "existence of the iron pin [in the northeast corner that] was called for in the Broom to Washburn and Washburn to Hodge deed is a sufficient marker for which this court can rely in delineating the boundaries...." The Cornelison's argue that the proper property marker or starting point is located approximately 104 feet south of the iron pin marking the northeast corner of the disputed area.

In *Quarles v. Arthur*, 231 S.W.2d 589 (Tenn. Ct. App. 1950), the Eastern Section of this Court stated:

> It is the duty of the court to construe a deed, if possible, to give effect to its several parts and avoid rejecting any of its provisions, the presumption being that the parties intended every part of the deed to have some meaning....
>
> It is clear from an analysis of the cases in this State dealing with the construction of deeds that the overriding purpose of all rules of construction is the ascertainment of the intention of the parties. In arriving at the intention the prime rule is that the meaning and intention will be gathered, if possible, from the instrument considered as a whole without regard to formed divisions or parts.

*Id*. at 590-91.

The Middle Section of this Court recently noted:

The rules governing the interpretation of deeds are well-settled and are designed to enable the courts to ascertain the intention of the parties to the deed. *Collins v. Smithson*, 585 S.W.2d 598, 603 (Tenn. 1979); *Barber v. Westmoreland*, 601 S.W.2d 712, 714 (Tenn. Ct. App. 1980). The courts should first seek the parties' intention by examining the words in the deed, *Hutchison v. Board*, 194 Tenn. 223, 227-28, 250 S.W.2d 82, 84 (1952), and by considering these words in the context of the deed as a whole. *Collins*, 585 S.W.2d at 603; *Barber*, 601 S.W.2d at 714; *Quarles v. Arthur*, 33 Tenn. App. 291, 295, 231 S.W.2d 589, 590 (1950).

*Mitchell v. Chance*, No. M2002-01239-COA-R3-CV, 2004 WL 792067, at *3 (Tenn. Ct. App. Apr. 12, 2004) (Slip Copy).

The deeds from Broom to Aspell, Karp and Morris to Kessler, Washburn to the Hodge's, Kessler to Rogers, and Rogers to the Cornelison's, all identify the beginning point and the dividing boundary line for the northern and southern tracts as "an iron pin in the western margin of the right-of-way of the Liberty Claybrook Road, said point being the northeast corner of the [Washburn or Hodge] tract; runs thence west 318 feet to an iron pin...." John Washburn and David Hodge both testified that three iron pins were in place marking the northeast, northwest, and southern tips of the southern tract at the time of their respective purchases. Appellee's expert, David Hall noted that the iron pins were in place at the time of his survey of the property, and further testified that the location of the pins was consistent with the specifications of the Broom to Washburn and Washburn to Hodge deeds. David Hall acknowledged that his measurements of the southern tract varied slightly from the distances called for in the deeds, stating:

Q. When you did the measurements [of Tract 1] were there some discrepancies as far as the lengths and measurements as they were called for in the deed?

A. Yes.

Q. Was there anything significant, in your mind, that you would find out of the ordinary in dealing with an old deed like this?

A. Not terribly. The dimensions were off some, but that's not unusual.

Q. From a general standpoint, what you found out there on the pins that were there, from a general standpoint, was that consistent with the deed to Mr. Hodge's and Mr. Washburn's property?

A. Pretty much, pretty much. The dimensions were off, like I say, but not terribly bad, 25 feet or so on the road frontage, the best I remember.

*****************************************************

Q. From a general standpoint, was that fence/tree line more consistent with the line that you found that went from iron pipe – from old pipe to old iron pipe?

A. Yes, it was in line.

Q. From a surveyor's background and from having done, I guess, countless numbers of surveys over the course of the years, is that something that is important to you from the standpoint of trying to figure out the intent of the original deeds?

A. Yes, it's evidence.

Q. If you compared the deed calls with the physical attributes that are out there – and when I'm talking about physical attributes, of course I'm talking about fence lines and tree lines. If you compared the deed calls with the physical attributes that are existing on that property, did it match up?

A. Within reason. Not exactly, but reasonably.

James Akin further testified that the three iron pins were in place when he conducted a mortgage survey of the southern tract for the Hodge's in 1995.

The plain language of the Washburn to Hodge deed references three iron pins as the boundary points for the southern tract, and specifically identifies the northern boundary line of the property as an east to west line running from the iron pin in the northeast corner to the iron pin in the northwest corner. The testimony in the record indicates that these pins were in place when John Washburn purchased the southern tract in 1972, and were still in place when the property was transferred to the Hodge's in 1995. We affirm the trial court's finding that "the existence of the iron pin [in the northeast corner of the Hodge property that] was called for in the Broom to Washburn and Washburn to Hodge deed is a sufficient marker for which this court can rely in delineating the boundaries."

We briefly address an allegation made by Rufert Rogers during his testimony at the January 27, 2003 hearing that John Washburn admitted to moving the northeast corner pin to the location recognized as proper by the trial court. Washburn denied moving the pin, and the trial court concluded that "John Washburn did not move the iron pins which delineated the boundaries of their property based upon the deed received from the Brooms." When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.*; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). It is evident that the trial court credited John Washburn's testimony, and we find no evidence in the record to preponderate against such a finding.

The trial court's conclusion that the iron pin located in the northeast corner of the southern tract is the proper starting point for delineating the boundary lines is further supported by evidence that both the Cornelison's and the Rogers's acquiesced to John Washburn's and the Hodge's use of the disputed wedge of land. The evidence in the record indicates that John Washburn and the Hodge's maintained the area south of the tree line/fence line, and treated the property as their own. John Washburn testified that he mowed the grass and maintained the land up to tree line/fence line, and noted that he placed a well in the disputed area. John Washburn further testified that Rufert Rogers approached him on one occasion to ask his permission to work on the fence in the tree line.

David Hodge testified that he has mowed and maintained the land to the south of the tree line/fence line since his purchase of the southern tract in 1995, and noted that he and his wife have erected several improvements in the disputed area, including a flower garden, birch tree, and a deck underneath a group of oak trees.

Rufert Rogers acknowledged that John Washburn and David Hodge maintained the land to the immediate south of the tree line/fence line, and testified that he was aware of a dispute regarding the precise placement of the boundary line dividing the northern and southern tracts in 1977. Despite knowledge of the existing dispute, Rufert Rogers testified that he had no reason to take John Washburn or the Hodge's to court. We note, further, that Christopher Cornelison testified that the Hodge's maintained or took care of "everything that was up to and south of" the tree line/fence line. From our review of the record, it is apparent that Rufert Rogers, despite testimony to the contrary, treated the tree line/fence line as the southern boundary of his property. Moreover, it is evident that the Cornelison's made no attempt to maintain the property to the south of the tree line/fence line and, in spite of their knowledge of the disagreements surrounding the boundary line, made no attempts to eject or prohibit the Hodge's from use of the disputed area.

We are further unpersuaded by the Cornelison's argument that the fence post located at the northwest corner of the northern tract, and not the iron pin at the northeast corner of the southern

tract, is the "most reliable evidence for determining the boundaries...." The corner fence post is not referenced in the deed from Rufert Rogers to the Cornelison's, nor in any of the preceding deeds to the northern tract.

We address, finally, the Cornelison's assertion that the trial court erred in finding that "the original intent of the parties was for the old fence or tree line to be the boundary of the property between these two tracts of land." Although none of the deeds included in the record on appeal reference the tree line/fence line as an intended boundary line between the southern and northern tracts, there is testimony in the record to support the trial court's conclusion that the iron pins are "generally consistent" with the tree line/fence line. In his testimony at the hearing, David Hall acknowledged that the deed calls and the tree line/fence line did not exactly "match up," but noted that the tree line/fence line was "reasonably" consistent with "the line that [he] found that went" from the iron pin at the northeast corner of the southern tract to the iron pin at the northwest corner of the southern tract. Regardless, we note that the trial court's final judgment states only that "[t]he original pin used as the reference point for the northeast boundary of the Hodge property shall be replaced in the position designated in the survey of David Hall and the deeds to both tracts of land shall be reformed as necessary to conform with the survey of David Hall."[2] We do not interpret the trial court's order to establish the tree line/fence line as the accepted boundary line between the northern and southern tracts; rather, we construe the court's final judgment to provide the limited holding that the "original" location of the iron pin in the northeast corner of the southern tract marks the appropriate beginning point for delineating the boundary line between the southern boundary of the northern tract and the northern boundary of the southern tract.

We affirm the trial court's final judgment entered April 8, 2003. Costs of this appeal are assessed against the appellants, Shelly Renae Cornelison and Christopher Cornelison, and their surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.

---

[2] The location of the tree line/fence line is not explicitly indicated on or by David Hall's survey.